359 So.2d 528 (1978)
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES and Department of Insurance, Appellants,
v.
Myrtle McDowell McDOUGALL, Administratrix of the Estate of Samuel W. McDowell, Deceased, et al., Appellees.
No. DD-8 & FF-260.
District Court of Appeal of Florida, First District.
May 25, 1978.
Rehearing Denied June 28, 1978.
*530 Thomas F. Woods, of Woods, Johnston & Erwin; and James G. Mahorner, Tallahassee, for appellants.
John D. Caminez, Julius F. Parker, Jr., of Madigan, Parker, Gatlin, Truett & Swedmark, Tallahassee, for appellees.
McCORD, Chief Judge.
Appellee, Myrtle McDowell, as administratrix of the Estate of Samuel W. McDowell, brought this action for wrongful death on behalf of herself and the children of her marriage to decedent. She contends that the decedent's death was caused by the negligence of appellants. Appellants denied that the death resulted from any negligence on their part and filed a third party complaint against one Grady Parrish, Leon County Sheriff Raymond Hamlin and Sheriff Hamlin's insurance carrier, Appalachian Insurance Company, alleging that negligence on the part of the Leon County Sheriff's Department was the proximate intervening cause of McDowell's death. The trial court entered a summary judgment on behalf of the third party defendants and after trial entered final judgment for $70,000 against appellants and in favor of appellee. The two cases which are here consolidated are appeals from the summary judgment and the final judgment. We affirm.
The events from which this cause of action stemmed are as follows: On April 26, 1974, the Circuit Court of Leon County, Florida, found Grady Parrish, who was charged with a criminal offense, not guilty by reason of insanity and committed him to the Florida State Hospital pursuant to Fla. R.Crim.P. 3.460 finding that he was manifestly dangerous to himself and to the peace and safety of the people. Parrish was thereafter admitted to the hospital and at the time of his admission, the admitting physician, Dr. Rodriquez, noted the following:
1. The court-appointed psychiatrists had determined Parrish to be dangerous.
2. Parrish stated to Dr. Rodriquez that he had tried to kill other people when drunk before.
3. There was a sound psychiatric basis to believe that Parrish was dangerous to others.
Dr. Susan Bohn, Parrish's treating psychologist knew that the offense for which Parrish was committed involved an armed breaking and entering. Twelve days after Parrish's commitment he escaped carrying a knife and was apprehended the same day. After his recapture he was confined in the maximum security ward for almost three months. He then underwent a staffing procedure to ascertain whether or not he was legally dangerous to others as a result of mental illness. It was the unanimous consensus of the staff at that time that he was dangerous to others. The staff report, dated September 26, 1974, contained a past history of Parrish which indicated that he had been charged with four escapes since 1955, that he had gone AWOL from the National Guard, and that in his case escape was a recurrent behavioral pattern. The hospital had full knowledge of his propensity to escape. In addition the hospital report noted that his F.B.I. rap sheet indicated 26 charges, that he was shot twice in fights, and that when on alcohol he was likely to do anything suggested to him. The rap sheet revealed that in the past he had been charged with carrying a short barrel shotgun and assault with a deadly weapon.
The purpose of the September 26, 1974 staff report was to request authorization from the committing court to retain Parrish on the grounds that he was still dangerous. Hospital doctors Bohn and Ogburn subsequently, on January 17, 1975, had a five minute conference and decided to transfer Parrish from the more secure forensic unit to the general population of the hospital. This conference did not include Parrish's *531 treating physician, Dr. Onate. Dr. Bohn, Parrish's primary treating psychologist, testified that at that time it was her opinion that Parrish was dangerous to others and was still an escape risk. Dr. Bohn at that time considered that he should not be allowed to go to class unescorted. Parrish was then transferred to Unit 4, a less secure unit of which Dr. Dachtera was the treating physician and at the time of this transfer, Dr. Dachtera did not have Parrish's main records which included the summary of the September 26, 1974 staff report.
During the period from January 16 through February 11, Parrish was on 600 milligrams of thorazine, a relatively large dose, and this medication had a calming effect upon him. Such a large dose of this drug is used to treat a person who shows severe abnormality or psychotic disorder. During this period, the testimony shows that Parrish's most probable diagnosis was psychotic, organic brain syndrome, secondary to chronic alcoholism with a history of alcoholic blackouts; that it was consistent with his history that at this time he was extremely dangerous when drunk; that alcohol would give him alcoholic blackouts or an amnesia state in which he did not know or care what he did.
On January 30, 1975, Parrish was issued a partial privilege card under which he would be accompanied to an alcoholics anonymous class outside Unit 4 by hospital personnel. On February 11, 1975, when in violation of hospital procedure Parrish was allowed to leave Unit 4 to attend the alcoholics anonymous class without being accompanied by hospital personnel, he escaped by walking off the hospital grounds. His escape was not reported by the class instructor for three hours and fifteen minutes as a result of poor hospital procedure. Dr. Dachtera then reported Parrish missing and placed him on escaped status. She noted that he had come to the hospital with a history of violent and unpredictable behavior, and she reported that he was still dangerous and should be returned to the forensic unit upon apprehension. At the time of his escape, he was, as aforesaid, on 600 milligrams of thorazine, and when it wore off in two or three months, he would again become dangerous.
After his escape the hospital notified the Chattahoochee Police Department, and that department issued an all points bulletin but the bulletin did not notify law enforcement authorities that Parrish was dangerous nor did it mention the nature of his commitment to the hospital. The all points bulletin went to the Leon County Sheriff's Office as well as to other law enforcement officials of the state. Parrish returned to his home in Leon County where he apparently lived normally and without incident until the thorazine wore off and the altercation occurred in which he killed McDowell when drunk at approximately 8:40 p.m. on May 4, 1975. There is testimony that the Leon County Sheriff's Office took procedures to locate and apprehend Parrish, and there is also testimony from Parrish's family that Leon County deputies saw him on several occasions but made no effort to apprehend him. This was denied by testimony of sheriff's deputies, and such conflict in the evidence was resolved by the trial court's final judgment in favor of appellee.
In granting the summary judgment on the third party claim, the trial court found that even if the employees of the Office of the Sheriff of Leon County knew that Parrish had been committed to the state hospital as being manifestly dangerous to himself and to the peace and safety of the people, the act of Parrish in killing McDowell was not a foreseeable consequence of the failure of the employees of that office to arrest or apprehend Parrish; that their negligence, if any, therefore, was not a proximate cause of the death of McDowell. Appellants contend that the trial court's granting of the summary judgment is inconsistent with the final judgment against the hospital; that if the incident was a foreseeable consequence of Parrish's escape from the hospital, it was likewise a foreseeable consequence of the sheriff's failure to apprehend him. It is unnecessary, however, that we resolve the question of foreseeability as to the sheriff because we find the entry of the summary final judgment was correct for another reason.
*532 This action was brought as a result of the state's partial waiver of its sovereign immunity which it accomplished by § 768.28, Florida Statutes. That statute states in pertinent part as follows:
"(1) In accordance with s. 13, Art. X, state constitution, the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act. Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act." (Emphasis supplied.)
It should be noted that sovereign immunity has been waived only to the extent specified in the act, and the act states that such immunity is waived for injury or death caused by the negligent or wrongful act or omission of any employee while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable. It is obvious that a private person would never be liable for his failure to apprehend a dangerous escaped mental patient under the circumstances involved in this case. Thus, sovereign immunity has not been waived by the state as it relates to the actions of the Leon County Sheriff's Office in this instance. Further, there has been no showing that the sheriff is liable because of a special duty to McDowell. See Modlin v. City of Miami Beach, 201 So.2d 70 (Fla. 1967).
The case in relation to waiver of sovereign immunity as to the actions of the employees of the state hospital, however, falls in a different category. Operators of a private hospital who negligently allowed a dangerous mental patient to escape would be liable for the resulting injury that such patient did to another person if the injury was a foreseeable result of the negligence. The state would likewise be liable under the same circumstance by virtue of its waiver of sovereign immunity. The question of appellant's liability, therefore, turns on the question of whether or not it was foreseeable that this dangerous mental patient, if allowed to escape from the state hospital, would be likely to injure or kill someone. Under the evidence of this case as above related, such result was foreseeable, and the negligence of appellant's employees was, therefore, the proximate cause of McDowell's death. There was no affirmative intervening cause shown by the evidence to have caused the death.
Appellants contend that the principle of law stated in Modlin bars appellees' action against appellants. The doctrine established by Modlin related to suits against governmental entities prior to the enactment of § 768.28, Florida Statutes. Under Modlin, a governmental agency was not liable for negligence of its employees unless the duty which was breached by the employee was a duty owed to the injured party as distinguished from a duty owed to the public generally. § 768.28 has now abrogated that rule as to actions falling within the realm of that section, and in such cases a state agency is liable for a wrongful act or omission of any employee of the agency while acting within the scope of his office or employment under circumstances in which the state or such agency, if a private person, would be liable to the claimant in accordance with the general laws of this state.
Subsection (5) of § 768.28 restricts the state's monetary liability by the following statement:
"Neither the state nor its agencies or subdivisions shall be liable to pay a claim or a judgment by any one person which exceeds the sum of $50,000 or any claim or judgment, or portions thereof, which, *533 when totaled with all other claims or judgments paid by the state or its agencies or subdivisions arising out of the same incident or occurrence, exceeds the sum of $100,000."
Appellants contend payment of the final judgment must be restricted to the sum of $50,000 because this is a claim by one person  the administratrix of the estate of Samuel W. McDowell, and only one judgment. We disagree. The judgment here is a judgment under § 768.20, Florida Statutes, for the several claims of Myrtle McDowell, the decedent's widow and the decedent's children. The aforesaid § 768.20 requires that the suit be filed in the name of the administratrix but it includes the several claims of all persons entitled to recover for the death by wrongful act of the decedent. Under these circumstances, this is not the claim of or judgment for one person. Therefore, payment of the judgment is limited by only the $100,000 ceiling stated in the above-quoted statute.
We have considered the other points raised by appellants and find them to be without merit.
AFFIRMED.
BOYER and MILLS, JJ., concur.