[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 10, 2005
THOMAS K. KAHN
CLERK

No. 03-14784

D. C. Docket No. 02-10064-CV-JLK

LOUISE COOK, as personal
representative of the Estate of
Daniel F. Tessier, and Jonathan
Tessier, a minor,

Plaintiff-Appellant,

versus

SHERIFF OF MONROE COUNTY,
FLORIDA, Rick Roth, Sheriff,

Defendant-Appellee.

———————————————

Appeal from the United States District Court
for the Southern District of Florida

———————————————

**(March 10, 2005)**

Before HULL and MARCUS, Circuit Judges, and HANCOCK[*], District Judge.

MARCUS, Circuit Judge:

---

[*]Honorable James H. Hancock, United States District Judge for the Northern District of Alabama, sitting by designation.

This sad case arises out of the 1999 suicide death of Daniel Tessier ("Tessier"), who, at the time of his death, was incarcerated at the Monroe County Detention Center ("MCDC"). Louise Cook, as Personal Representative of the Estate of Daniel F. Tessier ("Cook"), brought this action against the Sheriff of Monroe County, Rick Roth, in his official capacity, on behalf of Tessier's estate and Jonathan Tessier, the minor child of Cook and Tessier. Cook alleges three bases for liability: first, she claims that the Sheriff was deliberately indifferent to Tessier's medical needs, in violation of federal law, 42 U.S.C. § 1983; second, she says that the Sheriff is liable under Florida tort law for negligent supervision, training, and management of MCDC employees; finally, she asserts that the Sheriff is vicariously liable under Florida tort law for the negligent failure of MCDC employees to prevent Tessier's suicide.

Cook's case was tried in the United States District Court for the Southern District of Florida,[1] and Cook now appeals from the district court's entry of judgment as a matter of law for the Sheriff on all counts at the close of Cook's case. Cook also appeals the trial court's <u>in limine</u> rulings excluding evidence of

---

[1]Cook initially sued in the Circuit Court of the Sixteenth Judicial Circuit in Monroe County, Florida, but, pursuant to the Sheriff's motion for removal under 28 U.S.C. § 1441, the case was removed to federal district court.

other suicides occurring in the MCDC, as well as the testimony of a suicide expert retained by Cook.

After careful review of the record, we affirm the trial court's judgment for the Sheriff on Cook's § 1983 and negligent training and supervision claims, but we conclude that the trial court erred in granting judgment as a matter of law on Cook's vicarious liability negligence claim. We further hold that the trial court acted within its discretion in excluding evidence of other MCDC suicides and the testimony of Cook's expert. We therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

The essential facts are these. Daniel Tessier was arrested for auto theft on May 18, 1999, and was subsequently processed and placed into the general population ("Unit G") of the MCDC. The following morning, May 19, 1999, at 10:30 a.m., Tessier made a written request to see a psychiatrist, stating: "NeeD To se PHSYCAATRISe and docToR." Deputy Kenneth Kerr, the detention deputy assigned to Unit G that morning, testified at trial that he received and logged Tessier's request, which was then placed into a box designated for medical requests. Pursuant to MCDC procedures, nurses are supposed to pick up all medical requests during their twice-daily rounds and pass them on to facility

3

doctors. The date stamp on Tessier's request, however, reads "May 20, 1999," indicating that MCDC's medical department (known as "Medical") did not receive the request until the day after Tessier submitted it.

Deputy Kerr further testified that, when he observed Tessier on May 19, Tessier seemed nervous and appeared to be having an anxiety attack. Tessier approached Kerr later in the day complaining of chest pains, which prompted Deputy Kerr to send Tessier to Medical. Deputy Kerr did not inform Medical of Tessier's apparent anxiety or his request to see a psychiatrist.

A nurse examined Tessier at 2:45 p.m. on May 19. Tessier complained of difficulty breathing, pain in the left side of his chest cavity, and numbness in his right hand. The nurse performed an electrocardiogram, the results of which were "borderline." The nurse then placed Tessier on sick call, noting in his chart that the "inmate state[d] he fe[lt] better -- placed on Dr. call for re-eval." Tessier was returned to Unit G, but continued to complain of chest pains. Deputy Kerr instructed Tessier to lie down and told him that if "he wasn't feeling good in a little while [Deputy Kerr] would send him back again."

At approximately 4:00 that afternoon, May 19, Deputy Kerr received instructions to transfer Tessier to Unit A, the MCDC's disciplinary unit, and was informed that Tessier's phone privileges had been revoked for allegedly making

4

harassing phone calls to witnesses. Deputy Kerr transferred Tessier into the custody of Deputy Robert Malopolski, telling him to "keep an eye on Tessier because he had been complaining of chest pains."

Tessier was placed alone in a cell in Unit A. Deputy Malopolski observed Tessier to be nervous and anxious, and instructed him to take deep breaths and relax, and to push the intercom on the wall if he needed assistance. Deputy Malopolski thereafter responded to several intercom calls by Tessier. On one occasion, at approximately 5:00 p.m. on May 19, Deputy Malopolski found Tessier bent over on his knees on the floor of his cell, apparently having trouble breathing. Deputy Malopolski then contacted Medical, which came and took custody of Tessier.

Tessier stayed in Medical overnight, and Dr. Carol Daniels[2] treated him the following day, May 20, 1999, at 11:45 a.m. Dr. Daniels diagnosed Tessier with pleuritis, a benign condition, and ordered that Tessier be given a chest x-ray and Motrin. Tessier was discharged back to Unit A around 5:00 p.m the same day. Deputy Malopolski observed that Tessier still appeared very nervous on his return.

---

[2]Dr. Daniels, a medical doctor with a specialty in internal medicine, was employed by Prison Health Services, a company with which the Sheriff contracted to provide medical services at the MCDC.

Deputy John Whortenbury took over the night shift in Unit A at 6:00 p.m. on May 20. He was not advised that Tessier had visited Medical or that he had requested to see a psychiatrist, although he was told that Tessier had lost his phone privileges. Deputy Whortenbury observed Tessier to be "quiet, mostly polite, nervous or concerned -- maybe apprehensive about being in Unit A. He had a moderate energy level, and his mannerisms and conversation gave me the impression that he was ok."

Later that evening, at 9:20 p.m., Tessier made a second written request to see a psychiatrist, this time stating: "Need To See PHSYCATRIST AT SOON AS POSSIBLE. MeNTALY SICK, PROBLEM To BreaD." Deputy Whortenbury testified that he asked Tessier if the request was "something that needs to be done now or can [it be] handled on the next scheduled basis," and Tessier told him "the next scheduled time would be fine." Deputy Whortenbury then signed Tessier's request form and placed it in the pick-up box designated for medical requests.

At 9:35 the following morning, May 21, 1999, a deputy discovered Tessier in his cell, having hanged himself from a bedsheet. The last hourly check on Tessier occurred at 9:07 a.m., indicating that he had hanged himself sometime between 9:07 and 9:35. Attempts to fully revive Tessier failed, and he died two days later in the hospital when his family decided to discontinue life support.

6

Cook's case against the Sheriff proceeded to trial before a jury on August 6, 2003. Cook's witnesses included, in addition to herself and Jonathan Tessier, Deputies Kerr, Malopolski, and Whortenbury; Dr. Daniels; Dr. Tanju Mishara, Ph.D., a psychologist who treated MCDC inmates; Captain Rick Remley, the commander of detention services, who was in charge of MCDC operations at the time of Tessier's suicide; Major Tommy Taylor, the head of the Monroe County Bureau of Corrections, which encompassed three detention facilities; and Sergeant Fernando Lopez, who was the MCDC shift sergeant at the time of Tessier's suicide and the MCDC training sergeant at the time of trial. At no point during trial did Cook seek to introduce the testimony of her suicide expert, Dr. Maris.

The three deputies and Dr. Daniels testified primarily about their interactions with Tessier in the days and hours leading up to his suicide, as described above. Dr. Mishara commented on Tessier's requests to see a psychiatrist, explaining that the second request, in particular, would have caused her concern as a psychologist. On cross-examination, she clarified that the May 20 request was not "an emergency situation," and would not have been "interpret[ed] as someone who is going to be committing suicide unless there is a history or is a mental illness or depression or something like that." Instead, the inmate "would be someone that would be on [the MCDC psychologists'] list the

7

next time that we are there." Dr. Mishara did say, however, that "[i]f a person came to me having written this [second request], I would certainly screen them for suicide." In addition, Dr. Mishara described the MCDC's procedures for processing and responding to inmate requests for psychiatric or psychological help, as well as her involvement in training deputies in suicide prevention.

Captain Remley, Major Taylor, and Sergeant Lopez further elaborated on MCDC procedures for training deputies in suicide prevention and for addressing inmate medical requests. As to the former, MCDC deputies are trained in suicide prevention, among other things, at the start of their employment, and are required thereafter to attend an annual retraining class that includes viewing a suicide prevention video.

The MCDC also maintains a written manual, the Sheriff's Policy and Procedure Manual (the "Manual"), which Cook introduced into evidence, and which includes a section on suicide prevention. The Manual contains a general statement of the MCDC's suicide prevention policy:

> It is the policy of the Monroe County Detention Facilities that all Detention Staff Members will be provided special training by qualified instructors in order to observe inmates for suicide potential during intake processing and for the identification and supervision of suicide-prone inmates during their incarceration. The suicide prevention and intervention program shall be developed[,] reviewed and approved by a qualified medical or mental health professional.

8

In addition, the Manual outlines screening procedures to be followed during inmate admission into the MCDC, including screening for alcohol or drug dependence, psychiatric problems, and history of suicide attempts; it enumerates a multitude of suicide risk factors and indicators; it prescribes crisis intervention techniques, explaining how to interact with a suicidal inmate and what sort of administrative and medical help to seek; and it establishes housing assignment guidelines for suicidal inmates, including suicide watch procedures.

As to inmate medical requests, requests for psychological or psychiatric help are treated in the same manner as any other medical request. The Manual contains the general policy that "[i]nmates filling out a medical request slip will be seen on the day the slip is completed or within twenty-four hours if the request is not urgent." According to the testimony of Major Taylor, requests for psychiatric attention, like all other medical requests, are given to medical personnel, who determine whether to refer the inmate to a psychiatrist.

After two days of testimony, when Cook had called all of her witnesses, the Sheriff moved, pursuant to Federal Rule of Civil Procedure 50(a), for judgment as a matter of law on all three of Cook's claims. The district court, ruling from the bench, granted the motion as to all claims, concluding that there had been no showing of deliberate indifference or negligent training and supervision on the

9

part of the Sheriff, nor was the evidence sufficient to enable a reasonable person to conclude that Tessier's suicide was foreseeable and therefore to hold the Sheriff vicariously liable for the failure of MCDC employees to prevent it. It is from this ruling, as well as from the trial court's in limine evidentiary rulings, that Cook now appeals.

## II.

We turn first to the district court's evidentiary rulings on the admissibility of evidence of other suicides occurring within the MCDC and of the testimony of Cook's suicide expert, Dr. Maris.

The legal framework against which we measure these evidentiary rulings is clear. We review a trial court's evidentiary rulings, including its rulings on the admissibility of expert testimony, for abuse of discretion. See, e.g., United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc); Wright v. CSX Transp., Inc., 375 F.3d 1252, 1260 (11th Cir. 2004); Maiz v. Virani, 253 F.3d 641, 662 (11th Cir. 2001). As we have recently explained, "the deference that is the hallmark of abuse-of-discretion review requires that we not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous. Thus, it is by now axiomatic that a district court enjoys 'considerable leeway' in making these determinations." Frazier, 387 F.3d at 1258 (citations and internal quotation marks

10

omitted). Abuse-of-discretion review "recognizes the range of possible conclusions the trial judge may reach. 'By definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review. As we have stated previously, the abuse of discretion standard allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."' Id. at 1259 (quoting Rasbury v. I.R.S. (In re Rasbury), 24 F.3d 159, 168 (11th Cir. 1994) (quoting United States v. Kelly, 888 F.2d 732, 745 (11th Cir. 1989))). "Thus, when employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." Id.

### A.

First, Cook appeals from the district court's order granting the Sheriff's Motion in Limine to Preclude Reference to Other Suicides. Cook sought to introduce at trial evidence of five other suicides occurring in the MCDC within a twenty-three-month period. Three of these suicides occurred prior to Tessier's, while two occurred afterwards. Cook argued that the other suicides were relevant to her negligence claims "to show Defendant's generalized business practice or

11

habit as regards the detection and prevention of suicides in general," and relevant

to her § 1983 claim to "establish[] a pattern of negligence by inadequately

trained/supervised personnel, such to demonstrate the Sheriff's deliberate

indifference."  Plaintiffs' Response Memorandum in Opposition to Defendant's

Motion to [sic] in Limine to Exclude Evidence of Other Suicides at 3, 6.  In

concert with this evidence, Cook also sought to offer testimony from her suicide

expert that six suicides in twenty-three months was an excessively high rate.

The district court, however, found that the "record [was] devoid of evidence

showing that the previous suicides would be relevant to Defendant's ability to

foresee the suicide of Plaintiffs' decedent or to Defendant's complete indifference

to the decedent," and granted the Sheriff's motion in limine.  Cook v. Roth, 264 F.

Supp. 2d 1062, 1064 (S.D. Fla. 2003).[3]  Although the district court did not explain

its reasoning in its order, when the issue came up again during a sidebar at trial,[4]

the court explained: "The mere fact that there are or are not suicides, I think, is

---

[3]At the March 7, 2003 status conference, Cook indicated her intent to introduce evidence of the other suicides, and the Sheriff expressed his opposition to the admission of such evidence. To resolve the issue, the district court afforded the parties the opportunity to file memoranda of law explaining their arguments, and advised the parties that the issue was "akin to" evidence of similar acts under Federal Rule of Evidence 404(b).

[4]During Cook's examination of Major Taylor, the Sheriff objected on relevancy grounds to the question of whether suicide was the leading cause of death in the MCDC.  After a prolonged sidebar discussion among the parties and the court, the trial court again ruled that Cook could "not go into, directly or indirectly, the other suicides."

12

going to depend on [a variety of] factors. What is the jail population, where does it come from, who are they, are they people that are more stable than others, all sorts of factors. It's awfully difficult."

We conclude that the trial court acted within its broad discretion in ruling that the evidence was not relevant.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. "Evidence of other crimes, wrongs, or acts," while "not admissible to prove the character of a person in order to show action in conformity therewith," "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Such evidence is properly admitted only if it "possess[es] probative value that is not substantially outweighed by its undue prejudice." United States v. Jernigan, 341 F.3d 1273, 1280 (11th Cir. 2003) (quoting United States v. Miller, 959 F.2d 1535, 1538 (11th Cir. 1992) (en banc)); see also Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

13

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

Cook's argument appears to be that evidence of the other suicides is admissible to demonstrate "knowledge" on the part of the Sheriff -- that is, to prove, based on a pattern of suicides, that Tessier's suicide was foreseeable. For purposes of Cook's § 1983 claim, this argument plainly fails. Under controlling case precedent, § 1983 requires that the defendant have "notice of the suicidal tendency of the individual whose rights are at issue in order to be held liable for the suicide of that individual." Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1539 (11th Cir. 1994) (en banc) (emphasis in original). Other suicides occurring in the MCDC are in no way probative of the Sheriff's knowledge of Tessier's suicidal tendencies. Thus, we have little trouble concluding that the trial court acted within its discretion in determining that the evidence was not relevant to Cook's § 1983 claim.

Whether the occurrence of five other suicides within a twenty-three month span is relevant to Cook's negligence claims is a closer question. However, we reiterate that we review a trial court's evidentiary rulings only for abuse of discretion, and "a district court enjoys considerable leeway in making these

determinations." Frazier, 387 F.3d at 1258 (citations and internal quotation marks omitted).

Cook suggests, in general terms, that the other suicides are relevant to her negligence claims because the Sheriff's awareness of the MCDC's suicide rate illustrates that his "failure to take reasonable precautions to prevent further suicides, including that of Tessier," was negligent. Plaintiffs' Response Memorandum in Opposition to Defendant's Motion to [sic] in Limine to Exclude Evidence of Other Suicides at 3. Whether a series of suicides is indeed probative of any fact material to either of Cook's negligence claims is a debatable issue. On the one hand, the occurrence of six suicides within twenty-three months may suggest that the MCDC's procedures for identifying and responding to suicide risks are deficient, particularly since Cook indicated that her suicide expert would testify that this suicide rate was "off the board in terms of statistical anomaly" for a facility with the population size of the MCDC. However, as the trial court observed, Cook did not establish that six suicides in twenty-three months is an unusually high rate for a facility like the MCDC -- that is, a facility whose population is comparable in terms of factors such as the proportion of mentally and emotionally unstable inmates. This failure to account for all (or even many)

of the factors pertinent to a facility's suicide rate substantially diminishes, if not eviscerates, the probative value of Cook's proffered evidence.

Moreover, as Cook conceded at oral argument, two of the other five suicides occurred <u>after</u> Tessier's. Accordingly, for purposes of Cook's claims, those two suicides surely could not have served to put the Sheriff on notice of any deficiencies in the MCDC's procedures for detecting or addressing suicide risks. Thus, the only even <u>potentially</u> relevant suicides are the three occurring <u>prior</u> to Tessier's.

As to those three suicides, regardless of whether they may possess some probative value, the trial court did not abuse its discretion in finding any probative value substantially outweighed by the risk of prejudice to the defendant or of misleading the jury, since the record suggests that the facts and circumstances of the other suicides differed materially from those surrounding Tessier's. Cook offered the district court no information whatsoever regarding the facts and circumstances of the other suicides occurring within the MCDC. The Sheriff, in his motion <u>in limine</u> to exclude the suicides, provided minimal details about four of the five, including two of those occurring prior to Tessier's. Inmate Larry Hounshell committed suicide on December 29, 1997, after being incarcerated for less than a day. In fact, Mr. Hounshell had not yet been booked, and committed

16

suicide in a holding cell by hanging himself from the cord attached to a telephone in the cell. Inmate Ralph Ogden committed suicide on September 25, 1998, after being incarcerated for about two hours. Like Mr. Hounshell, Mr. Ogden had not yet been booked, and he committed suicide in a holding cell, hanging himself with his underwear.

The differences between the circumstances of Tessier's suicide and those of these other decedents are numerous. Tessier had already been booked when he committed suicide; his suicide occurred on the fourth day of his incarceration; he committed suicide by hanging himself with a bedsheet; he was housed in an isolation cell within Unit A, the MCDC's disciplinary unit, at the time of his suicide. Moreover, the record reveals that Tessier made two written requests to see a psychiatrist during his incarceration, but received no psychiatric attention before his suicide. Even comparing what precious little we know about the other MCDC suicides to Tessier's the material differences in facts and circumstances are readily apparent.

Based on these factual differences among the suicides, and on the critical comparative facts we don't know anything about, the trial court reasonably concluded that any probative value the other suicides might have was substantially outweighed by their potential to mislead the jury and prejudice the defendant. See

17

Fed. R. Evid. 403. Thus, we conclude that the trial court did not abuse its discretion in excluding evidence of other suicides occurring within the MCDC. Cf. Watkins v. Bowden, 105 F.3d 1344, 1352 n.16 (11th Cir. 1997) (holding, in the case of a First Amendment employer retaliation claim, that the district court did not abuse its discretion in excluding testimony of other alleged victims of retaliation on the grounds that their testimony "was (1) too far removed in time from the period that [the plaintiff] worked in the office, and (2) not sufficiently similar to [the plaintff's] allegations to merit admission under Federal Rule of Evidence 404(b)"); Brooks v. Scheib, 813 F.2d 1191, 1194 (11th Cir. 1987) ("Courts traditionally have harbored strong misgivings about allowing allegations of past wrongdoing to bias judges and juries reviewing new charges.").

B.

Cook also appeals the trial court's decision to exclude the testimony of her proffered suicide expert, Dr. Ronald Maris, Ph.D.

Federal Rule of Evidence 702 lays out the circumstances in which expert testimony is admissible:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data,

18

(2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

A trial court, in determining the admissibility of expert testimony under Rule 702, must conduct "a rigorous three-part inquiry," considering whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)).

The proponent of the expert testimony carries a substantial burden under Rule 702. "The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and admissibility must be shown by a preponderance of the evidence." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999) (citing Daubert, 509 U.S. at 592 n. 10). Thus, the proponent must demonstrate that the witness is qualified to testify competently, that his opinions are based on sound methodology, and that his testimony will be helpful to the trier of fact. See, e.g., Frazier, 387 F.3d at 1260

("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion . . . ."); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2001); Maiz, 253 F.3d at 664.

In this case, the trial court did not abuse its discretion in concluding that Cook failed to carry her burden of establishing that Dr. Maris' testimony would assist the jury, and therefore that his testimony was inadmissible under the third prong of the Rule 702 inquiry.[5] In reaching this conclusion, we reiterate that we review a trial court's ruling on the admissibility of expert testimony only for an abuse of discretion, see, e.g., Gen. Elec. Co. v. Joiner, 522 U.S. 136, 138-39, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997); Allison, 184 F.3d at 1306, mindful of "the Supreme Court's directive that 'it is very much a matter of discretion with the court whether to receive or exclude the evidence,' and that an 'appellate court will not reverse . . . unless the ruling is manifestly erroneous.'" Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1312-13 (11th Cir. 2000) (quoting Joiner, 522 U.S. at 141). "This deferential standard is not relaxed even though a ruling on the admissibility of expert evidence may be outcome-determinative," Allison, 184

---

[5]Because neither the trial court nor the Sheriff expressed any reservations about Dr. Maris' qualifications or his methodology (the first two factors in the Rule 702 inquiry), and because Cook's burden is to establish all three prongs of the Rule 702 inquiry, we need not and do not consider these other two factors.

F.3d at 1306 (citing Joiner, 522 U.S. at 142-43), and thus we may affirm "even though we would have gone the other way had it been our call." Rasbury, 24 F.3d at 168 (citation omitted).

With this deferential standard in mind, we look first to the nature of the testimony Cook sought to introduce, and then to the trial court's treatment of that evidence. Cook initially indicated her intention to introduce Dr. Maris' testimony at the March 7, 2003 status conference, where she described Dr. Maris as "an expert in suicide prevention in correctional facilities." Cook conceded that she had not yet filed any summary of Dr. Maris' testimony with the trial court, but she asserted that Dr. Maris would testify about

> the procedures facilities should enact as well as how they should
> follow procedure. . . . He basically is going to talk about what was
> wrong with the procedures and policies of the [MCDC] and the fact
> with a relatively small population that is a lot of suicides in a two year
> period and something is intrinsically wrong with the system.

The trial court expressed reservations about the appropriateness of expert testimony on these issues. The court stated:

> That's telling the jury how to rule. That may be invading the
> province of the jury.
>
> If he has some knowledge not within the general understanding
> of the jury then an expert may be needed. I am not sure under
> Daubert -- whether just coming in and saying we agree with the
> defendant, we agree with the plaintiff and here's how you should rule.

Why can't the lawyer argue what it is he is going to say about the procedures are not correct and not right?

As to Cook's argument that Dr. Maris' testimony was relevant to demonstrate that "the detention facility really should have been put on notice because they had an inordinately high rate of suicide," the trial court told Cook:

> And you can argue that to the jury. You can say, look, you don't have to be a rocket scientist to understand if you have that kind of suicide rate you ought to look at the procedures.
>
> The lawyers can argue that. Having a witness argue it to the jury is what I have a problem with.

The district court further observed that "[i]t may well be that we need some sort of a Daubert hearing," but, notably, Cook never moved for such a hearing, and none was ever conducted.

Shortly thereafter, Cook filed an expert witness report, summarizing Dr. Maris' opinions. Without elaborating on the bases for these opinions, the report laid out ten specific opinions that Dr. Maris had formed "with a reasonable degree of medical, psychological, and suicidological certainty":

> First, MCDC failed to properly assess Tessier's suicidality, despite at least 2-3 written requests by Tessier for psychiatric treatment. MCDC's mental health and suicide assessment forms are inadequate to detect either mental illness or impending suicide. Daniel Tessier did in fact abuse alcohol and crack cocaine and had prior suicide ideation (all known suicide risk factors) and MCDC's assessment procedures failed to detect this.

22

Second, since MCDC's own suicide prevention policies and procedures admit that most jail suicides occur with[in] the first 72 hours of incarceration, Tessier should have been put on close observation (viz., within arm's reach 24/3) at admission. One hour checks are grossly insufficient to prevent jail hangings (which can occur in only 4 to 5 minutes; See Florida Model Jail Standards, 7.18).

Third, MCDC's suicide prevention training procedures are unclear and inadequate to prevent jail suicides. All that was mentioned in the record was some available in-service suicide prevention videos.

Fourth, had Daniel Tessier seen a psychiatrist @ MCDC and been properly evaluated and treated for anxiety (e.g., given a benzodiazepine) or depression (e.g. given an SSRI antidepressant), he would more likely than not have not suicided at MCDC.

Fifth, Officer Whortenbury should have read Daniel Tessier's 2nd written request for psychiatric treatment . . . and notified the MCDC Care Center . . . immediately. Two to three suicide "cries for help" were ignored by MCDC.

Sixth, MCDC had an excessive number of suicides in a two year period (viz., from 1997 to 99). The average jail suicide rate is 107/100,000 (Bonner, 1992). MCDC's probably exceeds the average rate (I am in the process of getting inmate population numbers which will allow me to calculate that MCDC suicide rate). MCDC failed to correct, modify, or otherwise change serious suicidogenic conditions at their jail. Officer Kerr was personally involved with 3 of the MCDC suicides.

Seventh, the cells at MCDC were not suicide proofed (See Florida Model Jail Standards, 8.07).

Eighth, MCDC was deliberately indifferent to Daniel Tessier's serious medical needs.

23

Ninth, MCDC violated Daniel Tessier's constitutional right to not suffer cruel and unusual punishment, by ignoring his written requests for psychiatric treatment and evaluation.

Finally, had MCDC responded appropriately and promptly to Daniel Tessier's psychiatric condition, it is more likely than not that he would not have committed suicide at the MCDC.

The Sheriff moved in limine to exclude or limit Dr. Maris' testimony, on the grounds that it was "not legally relevant to any of Plaintiff's claims," and that Dr. Maris' opinion that the MCDC was deliberately indifferent to Tessier was "a legal conclusion that does little more than tell the jury what result should be reached." Defendant Roth's Motion in Limine to Exclude/Limit Expert Witness Testimony at 5, 2.

The court "tentatively granted" the Sheriff's motion in limine to exclude Dr. Maris' testimony, providing further that "Plaintiffs may attempt to reintroduce expert testimony at trial once they have established other evidence tending to

24

show deliberate indifference on the part of Defendant."[6]  Cook, 264 F. Supp. 2d at

[6]Our review of the complete record in this case reveals that Cook never attempted to reintroduce Dr. Maris' testimony, even though the trial court explicitly gave her the opportunity to do so.  Although this Circuit has not squarely addressed the issue, when a trial court rules in limine tentatively to exclude evidence, most courts require that the party seeking admission of the evidence offer the evidence again at trial in order to preserve the issue for appeal.  See, e.g., Walden v. Ga.-Pac. Corp., 126 F.3d 506, 519 (3d Cir. 1997) ("[W]here a district court makes a tentative in limine ruling excluding evidence, the exclusion of that evidence may only be challenged on appeal if the aggrieved party attempts to offer such evidence at trial."); Tennison v. Circus Circus Enters., Inc., 244 F.3d 684, 689 (9th Cir. 2001); Rishell v. Wellshear, 1999 WL 426193, at **6 (10th Cir. June 25, 1999) (unpublished); Jenkins v. Keating, 147 F.3d 577, 581 (7th Cir. 1998); United States v. Holmquist, 36 F.3d 154, 166 & n.12 (1st Cir. 1994); see also Fed. R. Evid. 103 (a) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." (emphasis added)).

1064. The court reasoned:

> The record at this time is incomplete regarding the totality of the evidence to be yet presented on this issue. Plaintiffs may, or may not, meet their burden of demonstrating that the threshold (on deliberate indifference) has been met. This burden of proof must be met prior to the offering of expert testimony on screening procedures. Thus, the expert is precluded from testifying until such time as Plaintiffs present other evidence, besides inadequacies in the screening process, which give rise to a strong likelihood of deliberate indifference on the part of Defendant.[7]

Id. at 1063.

Although the trial court did not say so explicitly, the concerns it expressed about Dr. Maris' testimony in its order and the status conference (namely, whether Dr. Maris possessed any specialized knowledge not within the general

---

been "sharply brought to the Court's attention and by it articulately rejected," and appellant was therefore "entitled to accept the Court's ruling at face value").

[7]We note that the trial court's tentative ruling on the admissibility of Dr. Maris' testimony focused only on the testimony's relevance to Cook's § 1983 claim. The record makes clear, however, that Cook was offering the testimony to prove her negligence claims, as well. See, e.g., Plaintiffs' Response Memorandum in Opposition to Defendant's Motion to [sic] in Limine to Exclude/Limit Expert Witness Testimony at 3 (stating that Dr. Maris would testify "to the appropriate standard of care in detention facilities, the adequacy of medical and psychological care afforded inmates, and how such relates to the facts of our case"); id. at 6 ("Dr. Maris will offer testimony regarding the appropriate and governing standards of mental health care for inmates in jails and prisons instituted for the detection and prevention of suicide. Dr. Maris will explain the heightened degree of suicide risk for inmates and testify as to the reasonableness of Monroe County Detention Center policy/procedures, and the adequacy of the training, supervision and management of detention personnel."). In reviewing the trial court's ruling, we therefore consider whether Dr. Maris' testimony would assist the trier of fact in understanding matters related to Cook's § 1983 claim or to either of her negligence claims.

understanding of the jury and whether his opinions were anything Cook's lawyers could not just argue to the jury themselves) are best interpreted as implicating the third prong of the Rule 702 inquiry -- helpfulness to the trier of fact. "By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63 (citation omitted) (citing United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985) (observing that expert testimony is admissible if it offers something "beyond the understanding and experience of the average citizen")).

Moreover, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 921 (11th Cir. 1998) (quoting Joiner, 522 U.S. at 146). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Joiner, 522 U.S. at 146 (holding that the trial court did not abuse its discretion in excluding testimony on that basis). Thus, a trial court may exclude expert testimony that is "imprecise and unspecific," or whose factual basis is not adequately explained. Frazier, 387 F.3d at 1266

27

(finding no abuse of discretion when the trial court concluded that an "imprecise and unspecific" expert opinion would not assist the jury, and observing that the expert's "imprecise opinion easily could serve to confuse the jury, and might well have misled it"); see also id. at 1263 ("Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403. . . . Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." (citation omitted)).

Dr. Maris' testimony suffers from both of these defects. Some of the opinions expressed in his report concern matters that arguably lie within the understanding of the average lay person, making expert testimony unnecessary. Others are unsubstantiated by any factual basis, so that Cook has failed to carry her burden of demonstrating that they would be helpful to the jury. In addition, much of Dr. Maris' testimony is further lacking in any factual foundation, as required by Federal Rule of Evidence 702. See Fed. R. Evid. 702 (permitting expert testimony only if "the testimony is based upon sufficient facts or data"). Because the trial court excluded Dr. Maris' testimony in its entirety, we evaluate

28

each of his ten proffered opinions in turn, concluding that the trial court acted within its discretion in excluding all of them.

Dr. Maris' first opinion -- that the MCDC's assessment procedures failed to identify Tessier's suicidal tendencies -- arguably involves no "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702, and offers nothing "beyond the understanding and experience of the average citizen," Rouco, 765 F.2d at 995. The testimony of the three MCDC deputies makes abundantly clear that the MCDC failed to detect that Tessier was suicidal. Accordingly, the trial court acted within its discretion in determining that expert testimony to this effect was not appropriate.

Dr. Maris' second opinion -- that Tessier should have been put on close observation, and that hourly checks are insufficient -- may involve matters beyond the understanding of the average layperson. However, notably absent from this opinion are (a) any finding that MCDC personnel should have known Tessier was suicidal, and (b) any reference to -- let alone explication of -- any generally accepted standard of care for dealing with suicidal inmates. Because Dr. Maris's opinion that Tessier should have been placed under close observation is without a sufficient factual or medical foundation, again, the district court acted within its discretion in excluding it as being either unhelpful or misleading to the jury. Cf.

Frazier, 387 F.3d at 1266 (observing that an expert's "imprecise opinion easily could serve to confuse the jury, and might well have misled it").

Dr. Maris' third opinion -- that the MCDC's suicide prevention training was inadequate -- is without foundation, since Dr. Maris has articulated neither a generally accepted standard for suicide prevention training in jails, nor an explanation of how or why he believes the MCDC's training to be inadequate. Thus, this opinion "is connected to existing data only by the ipse dixit of the expert," Michigan Millers, 140 F.3d at 921 (quoting Joiner, 522 U.S. at 146), and was thus properly excludable by the district court.

Dr. Maris' fourth opinion -- that had Tessier received psychiatric treatment, he probably would not have committed suicide -- is similarly unsubstantiated and unspecific. It is presented without any supporting factual foundation, analysis, or explanation, and thus the trial court acted within its discretion in excluding it, too.

Dr. Maris' fifth opinion -- that Deputy Whortenbury should have read Tessier's request for a psychiatrist and notified Medical -- "offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63. The notion that a correctional officer should read and respond to an inmate's medical request seems to us to be well within the understanding of the

average layperson, and the trial court did not abuse its discretion in concluding that expert testimony on this point was not needed.

Dr. Maris' sixth opinion -- that the MCDC's suicide rate was disproportionately high -- is, like the testimony regarding training and supervision, not relevant to any fact in issue, since the trial court excluded all evidence pertaining to other suicides occurring within the MCDC. Thus, the trial court acted within its discretion in excluding this opinion.

Dr. Maris' seventh opinion -- that the MCDC's cells were not "suicide proofed" is indecipherable. Without any explanation of what this means or how it may be relevant, the district court acted well within its discretion in excluding this imprecise and unspecific opinion.

Dr. Maris' eighth opinion -- that MCDC "was deliberately indifferent" to Tessier's medical needs -- is another conclusion that "is connected to existing data only by the ipse dixit of the expert." Michigan Millers, 140 F.3d at 921 (quoting Joiner, 522 U.S. at 146). The opinion is unsubstantiated by any proffered facts, explanation, or analysis, and the trial court therefore acted within its discretion in excluding it.[8]

_____

[8]The Sheriff urged the trial court to exclude this opinion on the ground that it was "a legal conclusion that does little more than tell the jury what result should be reached." Defendant Roth's Motion in Limine to Exclude/Limit Expert Witness Testimony at 2. Although testifying

Dr. Maris' ninth opinion -- that the MCDC violated Tessier's constitutional right to be free from cruel and unusual punishment -- is a purely legal conclusion and is presented without any supporting factual basis. The trial court therefore acted well within its discretion in excluding it.

Dr. Maris' final opinion -- that "had MCDC responded appropriately and promptly to Daniel Tessier's psychiatric condition," he probably would not have committed suicide -- is nearly identical to his fourth opinion, and was properly excluded for the same reasons.

In holding that the trial court did not abuse its discretion in excluding Dr. Maris' testimony in its entirety, we stress that the burden of laying the proper foundation for the admission of expert testimony rests with its proponent. See, e.g., Allison, 184 F.3d at 1306. Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical

_____

experts may not offer legal conclusions, Federal Rule of Evidence 704(a) provides, in relevant part, that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a); see also United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977) ("Rule 704 abolishes the per se rule against testimony regarding ultimate issues of fact. By the same token, however, courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law.") (The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).). Because we have upheld the district court's exclusion of this opinion on other grounds, we need not and do not decide whether an expert opinion on "deliberate indifference" amounts to a conclusion of law.

support is simply not enough. The party offering the expert must present the witness' proposed testimony in a form that persuades the trial court that the testimony will in fact assist the trier of fact. As we have held previously, carrying this burden requires more than "the ipse dixit of the expert." Michigan Millers, 140 F.3d at 921. In upholding the trial court's exclusion of Dr. Maris' testimony, we do not suggest that it would have been impossible for Cook to extract from Dr. Maris some admissible expert opinions; we simply find that Cook did not carry her substantial burden of doing so here.

We recognize that a Daubert hearing before the trial court might have given Cook an additional opportunity to meet this burden, but we note that the trial court was under no obligation to hold one. As we have explained previously, "Daubert hearings are not required, but may be helpful in 'complicated cases involving multiple expert witnesses.'" United States v. Hansen, 262 F.3d 1217, 1234 (11th Cir. 2001) (quoting City of Tuscaloosa, 158 F.3d at 564-65 n. 21.). We also review a trial court's decision on whether to hold a Daubert hearing for abuse of discretion. As the Supreme Court has explained:

> Our opinion in Joiner makes clear that a court of appeals is to apply
> an abuse-of-discretion standard when it 'review[s] a trial court's
> decision to admit or exclude expert testimony.' 522 U.S., at 138-139,
> 118 S.Ct. 512. That standard applies as much to the trial courts
> decisions about how to determine reliability as to its ultimate

33

conclusion. Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises. Indeed, the Rules seek to avoid 'unjustifiable expense and delay' as part of their search for 'truth' and the 'jus[t] determin[ation]' of proceedings. Fed. Rule Evid. 102.

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152-53, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999); see also Toole, 235 F.3d at 1312 ("[W]e grant the district court the same broad latitude when deciding how to determine the reliability of expert testimony as it enjoys in determining whether the testimony is reliable."). Because this is not a "complicated case[] involving multiple expert witnesses" -- Dr. Maris was the only proffered expert -- we cannot conclude that the district court abused its discretion by not holding a Daubert hearing.

Again, we stress that it was Cook's burden -- not that of the trial court -- to lay the foundation for admission of Dr. Maris' testimony; because Cook failed to do so, the district court acted within its discretion in excluding Dr. Maris' testimony in its entirety.

III.

We turn now to the district court's ruling, at the close of Cook's case, on the Sheriff's motion for judgment as a matter of law on all three of Cook's claims.

34

We review the district court's grant of judgment as a matter of law de novo, applying the same Rule 50(a) standard that guided the trial court. See, e.g., McCormick v. Aderholt, 293 F.3d 1254, 1258 (11th Cir. 2002); Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999); Walker v. NationsBank of Fla., N.A., 53 F.3d 1548, 1555 (11th Cir. 1995). A motion for judgment as a matter of law is properly granted if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party on that issue." Fed. R. Civ. P. 50(a). In applying this standard, we examine the evidence in a light most favorable to the non-moving party. McCormick, 293 F.3d at 1258.

"Although the existence of a genuine issue of material fact precludes judgment as a matter of law, 'a jury question does not exist because of the presence of a "mere scintilla of evidence."' A motion for judgment as a matter of law will be denied only if 'reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.'" Mendoza, 195 F.3d at 1244 (citations omitted) (quoting Walker, 53 F.3d at 1555 (quoting Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989))). "These standards require us to consider 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. (citation omitted) (quoting Combs v.

35

Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997)). "If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted." Id. (citation and internal quotation marks omitted) (quoting Combs, 106 F.3d at 1526).

With this standard in mind, we address in turn the trial court's rulings on each of Cook's three claims.

### A.

First, Cook argues that deficiencies in MCDC procedures for processing and responding to inmate medical requests, as well as the Sheriff's failure to adequately train and supervise MCDC employees in suicide prevention, displayed deliberate indifference to the medical needs of suicidal detainees like Tessier, in violation of 42 U.S.C. § 1983. Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

36

A § 1983 claim is predicated on an alleged violation of an underlying constitutional right. In the case of a pre-trial detainee like Tessier, "the Eighth Amendment prohibitions against cruel and unusual punishment do not apply." Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994) (quoting Tittle, 10 F.3d at 1539 n.3). Nevertheless, "in regard to providing pretrial detainees with such basic necessities as . . . medical care[,] the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." Id. (quoting Hamm v. DeKalb County, 774 F.2d 1567, 1574 (11th Cir. 1985)). Thus, pretrial detainees like Tessier plainly have a Fourteenth Amendment due process right "to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide." Id. (citations omitted); see also Cagle v. Sutherland, 334 F.3d 980, 985 (11th Cir. 2003).

"[I]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under . . . the . . . fourteenth amendment, the plaintiff must show that the jail official displayed 'deliberate indifference' to the prisoner's taking of his own life." Cagle, 334 F.3d at 986 (quoting Edwards v. Gilbert, 867 F.2d 1271, 1274-75 (11th Cir. 1989)). "To establish a defendant's deliberate indifference, the plaintiff has to show that the defendant had '(1) subjective

37

knowledge of a risk of serious harm; [and] (2) disregard[ed] . . . that risk; (3) by conduct that is more than mere negligence." Id. at 987 (quoting McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). Under this Circuit's precedent, in a prison suicide case, deliberate indifference requires that the defendant deliberately disregard "a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." Id. at 986 (emphasis in original) (quoting Popham v. City of Talledega, 908 F.2d 1561, 1563 (11th Cir. 1990)). "[T]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with the care of prisoners." Id. (quoting Tittle, 10 F.3d at 1540).

When, as here, the defendant is the county sheriff, the suit is effectively an action against the governmental entity he represents -- in this case, Monroe County. McMillan v. Monroe County, 520 U.S. 781, 785 n.2, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997); see also Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) ("Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit

38

against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (citations and internal quotation marks omitted)).

Thus, to succeed on her § 1983 claim, Cook must establish that the Sheriff himself, as representative of Monroe County, was deliberately indifferent to the possibility of Tessier's suicide, since neither respondeat superior nor vicarious liability exists under § 1983. Belcher, 30 F.3d at 1396. As the Supreme Court has explained, its holding in Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), established that "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983." City of Canton v. Harris, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (emphasis in original). Thus, only when a "policy or custom" of the municipality inflicts the injury does § 1983 liability exist. Id. A failure to adequately train municipal employees constitutes an actionable policy or custom for § 1983 purposes "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." Id. at 388; see also id. at 389; Belcher, 30 F.3d at 1397-98.

Accordingly, "our first inquiry . . . is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, 489 U.S. at 385. After thorough review of the entire record in this case, we conclude that there is not. Cook in essence offers two municipal policies or customs that she believes establish such a link: first, the County's allegedly deficient procedures for processing and responding to inmate medical requests; and second, the County's failure to adequately train MCDC employees in suicide prevention. However, we need look no further than Cook's failure to establish that the County should have foreseen Tessier's suicide to conclude that any deficiencies that may exist in MCDC polices do not rise to the level of deliberate indifference.

Foreseeability, for the purpose of establishing deliberate indifference, requires that the defendant have had "subjective knowledge of a risk of serious harm," meaning, in a prison suicide case, knowledge of "a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." Cagle, 334 F.3d at 986 (emphasis in original). Moreover, because respondeat superior liability does not attach under § 1983, the defendant himself -- in this case, the Sheriff (as representative of the County) -- must have had this knowledge.

The record in this case is utterly devoid of any evidence that the Sheriff had any such knowledge. As we have explained previously, "[n]o matter how defendants' actions might be viewed, the law of this circuit makes clear that they cannot be liable under § 1983 for the suicide of a prisoner who never had threatened or attempted suicide and who had never been considered a suicide risk." Tittle, 10 F.3d at 1540 (quoting Schmelz v. Monroe County, 954 F.2d 1540, 1545 (11th Cir. 1992) (citation and internal quotation marks omitted)). Cook has presented no evidence that Tessier had previously attempted suicide or had ever been considered a suicide risk. Whether the failure of MCDC employees to identify Tessier as a suicide risk on May 19-21, 1999 amounts to negligence on their part is a wholly different question, which we address in a wholly different manner in Part II.B, infra. But, no negligence on the part of MCDC employees could alter the fact that the Sheriff -- the sole defendant in this § 1983 action -- himself had no actual knowledge that Tessier might take his own life.

Cook argues that the MCDC's allegedly defective procedures amount to "deliberate indifference toward a class of suicidal detainees to which Tessier belongs, and that the deliberate indifference toward that class caused constitutional harm to Tessier individually." Appellant's Br. at 29 (emphasis in original). However, as we have explained previously, under our precedent, the

41

defendant must have had "notice of the suicidal tendency of the individual whose rights are at issue in order to be held liable for the suicide of that individual." Tittle, 10 F.3d at 1539 (emphasis in original). Deliberate indifference, in the jail suicide context, is not a question of the defendant's indifference to suicidal inmates or suicide indicators generally, but rather it "is a question of whether a defendant was deliberately indifferent to an individual's mental condition and the likely consequences of that condition." Id. (emphasis added). For this reason, "[a]bsent knowledge of a detainee's suicidal tendencies, [our] cases have consistently held that failure to prevent suicide has never been held to constitute deliberate indifference." Popham, 908 F.2d at 1564. Thus, even if Cook had established the Sheriff's deliberate indifference toward suicidal inmates in general -- and, on this record, precious little evidence points to such a conclusion -- this would not suffice to demonstrate the foreseeability of Tessier's suicide and to hold the Sheriff liable under § 1983.[9]

Because Cook has failed to demonstrate that Tessier's suicide was foreseeable to the Sheriff, the sole defendant in this case, "there is no legally

---

[9]Because Tessier's suicide was not foreseeable, we need not and do not consider whether the remaining elements of deliberate indifference are present here -- namely, whether the County, through its policies, disregarded the risk of suicide, by conduct that was more than merely negligent. See Cagle, 334 F.3d at 987.

42

sufficient evidentiary basis for a reasonable jury to find" deliberate indifference. Fed. R. Civ. P. 50(a). Accordingly, the district court properly entered judgment as a matter of law for the Sheriff on Cook's § 1983 claim.

B.

Cook's second claim is that the Sheriff is liable for Tessier's suicide death under Florida tort law, since Tessier's suicide was a probable and foreseeable consequence of the Sheriff's negligent failure to train and supervise MCDC employees. This claim is barred by Florida's sovereign immunity law; we, therefore, conclude that the district court did not err in granting the Sheriff's motion for judgment as a matter of law on this claim as well.

As a panel of this Court has previously acknowledged, under Florida law, "a governmental agency is immune from tort liability based upon actions that involve its 'discretionary' functions." Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001) (citing Dep't of Health & Rehabilitative Servs. v. Yamuni, 529 So.2d 258, 260 (Fla. 1988)). As the Supreme Court of Florida has explained recently, "if a duty of care is owed, it must then be determined whether sovereign immunity bars an action for an alleged breach of that duty. In making this assessment, it is necessary to ascertain the character of the allegedly negligent governmental act or omission. As this Court has determined, basic judgmental or

43

discretionary governmental functions are immune from legal action, whereas operational acts are not protected by sovereign immunity." Pollock v. Fla. Dep't of Highway Patrol, 882 So. 2d 928, 933 (Fla. 2004) (citation omitted).

A discretionary function, under Florida law, is one in which "the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning." Henderson v. Bowden, 737 So. 2d 532, 538 (Fla. 1999) (citation and internal quotation marks omitted). "An 'operational' function, on the other hand, is one not necessary to or inherent in policy or planning, that merely reflects a secondary decision as to how those policies or plans will be implemented." Id. (citation and internal quotation marks omitted). Florida's discretionary function exception to its general waiver of sovereign immunity "is grounded in the doctrine of separation of powers," and "it would be an improper infringement of separation of powers for the judiciary, by way of tort law, to intervene in fundamental decisionmaking of the executive and legislative branches of government, including the agencies and municipal corporations they have created." Kaisner v. Kolb, 543 So. 2d 732, 736-37 (Fla. 1989).

Applying these Florida sovereign immunity principles, in Lewis v. City of St. Petersburg, a panel of this Court addressed a tort claim brought on behalf of the estate of a motorist shot and killed by St. Petersburg police officers, alleging that the city negligently failed to train the officers. Although, under Florida law, "an employer is liable in tort for reasonably foreseeable damages resulting from the negligent training of its employees and agents," Lewis, 260 F.3d at 1265, the Court affirmed the dismissal of plaintiff Lewis' negligent training claim, finding it barred by Florida sovereign immunity law. The Court observed that "Lewis does not challenge the implementation or operation of the City's police training program as it relates to the officers involved in the shooting, but rather Lewis challenges the City's policy decisions regarding what to include in the training of its police officers." Id. at 1266. The Court reasoned that "[a] city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning." Id. Thus, Lewis' challenge to the reasonableness of these training policies was barred by "the 'discretionary' function exception to [Florida's] waiver of sovereign immunity." Id.

Here, as in Lewis, the challenged actions are the Sheriff's decisions regarding "how to train its [corrections] officers and what subject matter to include

45

in the training." Id.; see, e.g., Appellant's Br. at 27 ("MCDC's suicide awareness and prevention training consists of films shown once a year. . . . Surely more effective methods of supervising and training detention officers were available to the Sheriff."); id. (characterizing the issue as "[w]hether the Sheriff's methods of training and supervising personnel were reasonably effective, and whether more effective methods could have prevented Daniel Tessier's suicide").

Thus, as in Lewis, "the acts which [Cook]'s negligent training claim challenge[s] are 'discretionary' governmental functions immune from tort liability."[10] Lewis, 260 F.3d at 1266. To find otherwise would amount to judicial intervention, by way of tort law, into the fundamental decisionmaking of the legislative and executive branches -- a practice against which the Florida courts have repeatedly cautioned. See, e.g., Henderson, 737 So. 2d at 538; Kaisner, 543 So. 2d at 736-37. Accordingly, we affirm the trial court's grant of judgment as a matter of law on Cook's negligent training and supervision claim.[11] See Kaisner,

_____

[10]Accordingly, we note that even if the district court had abused its discretion in excluding as irrelevant Cook's proffered evidence of other suicides occurring in the MCDC -- which it did not -- such an error would in no way affect Cook's negligent training and supervision claim, since sovereign immunity is a legal limitation that no amount of relevant evidence can overcome.

[11]The trial court granted judgment as a matter of law on the ground that Cook's evidence demonstrated that the training supplied "was sufficient." The court "recognize[d] that [Lewis] indicate[d] that there is no duty to train per se," but did not rule on this ground, reasoning that "in a real world, logically, a sheriff in a county situation, governmental situation, would understandably feel an obligation to do training." Because we conclude that Cook's negligent

46

543 So. 2d at 734 ("A court must find no liability as a matter of law if either (a) no duty of care existed, or (b) the doctrine of governmental immunity bars the claim.").

C.

Cook's third claim is that the Sheriff is vicariously liable, under Florida tort law, for the negligence of MCDC employees in failing to take appropriate measures to prevent Tessier's suicide death. Because the evidence was sufficient to support a jury verdict in Cook's favor on this claim, we reverse the district court's grant of judgment as a matter of law for the Sheriff and remand for trial on the merits of this claim.[12]

It is long established that, under Florida law, corrections officers owe individuals within their custody a duty to use reasonable care for their safety. See,

---

training claim is barred by Florida sovereign immunity law, we need not and do not consider whether the evidence presented could support a jury finding of negligence.

[12]As a preliminary matter, the precise scope of a sheriff's vicarious liability for negligence committed by jail employees is a question of Florida sovereign immunity law, which we need not address in depth, since the parties do not dispute that the Sheriff may be held vicariously liable if MCDC employees are found to have acted negligently. It suffices here to note that a sheriff, as "an official of a political subdivision" of the state, Beard v. Hambrick, 396 So. 2d 708, 712 (Fla. 1981), is liable under Florida law "for a wrongful act or omission of any employee of the agency while acting within the scope of his office or employment under circumstances in which the state or agency, if a private person, would be liable to the claimant in accordance with the general laws of the state." Dep't of Health & Rehabilitative Servs. v. McDougall, 359 So. 2d 528, 532 (Fla. Dist. Ct. App. 1978).

e.g., Kaisner, 543 So.2d at 734 (observing that any individual placed in custody or otherwise detained by law enforcement officers is owed a common law duty of care); Hargrove v. Town of Cocoa Beach, 96 So. 2d 130 (Fla. 1957) (recognizing liability in negligence when an inmate died of smoke inhalation due to corrections officer's leaving the jail unattended); Hutchinson v. Miller, 548 So. 2d 883, 885 (Fla. Dist. Ct. App. 1989) ("Clearly, the sheriff and his deputies owed the decedent the duty to use reasonable care for his safety when he was incarcerated."). Thus, when acts or omissions of a corrections officer result in injury to an inmate within the officer's custody, the officer may be liable in negligence for the harm suffered by the inmate.[13]

Self-infliction of injury, however, is treated as an independent intervening cause, which may suffice to break the causal connection between the conduct of

---

[13]Although the Sheriff has not raised sovereign immunity as a defense to Cook's vicarious liability negligence claim, it bears noting that, under Florida law, a county's treatment of an individual inmate in its custody is an operational function, for which the State of Florida has waived governmental immunity. See, e.g., Henderson, 737 So. 2d at 538-39 ("A person taken into custody . . . is owed a common law duty of care. Numerous cases have recognized that this duty of exercising reasonable care exists and that it is an operational level function." (citation and internal quotation marks omitted); Dep't of Health & Rehabilitative Servs. v. Whaley, 574 So. 2d 100, 101 (Fla. 1991) (holding that the assignment of juveniles to a particular room within a detention facility is an operational function not protected by sovereign immunity); Kaisner, 543 So. 2d at 738. When the challenged action involves not "the policies themselves," but "the way [they] were implemented," the action is operational rather than discretionary. Id. at 738. Because Cook's vicarious liability claim challenges the manner in which MCDC procedures were implemented through individual corrections officers -- not the procedures themselves -- that claim is not barred by sovereign immunity.

48

the corrections officer and any injury sustained by the inmate. See, e.g., Guice v. Enfinger, 389 So. 2d 270, 271 (Fla. Dist. Ct. App. 1980). However, causation is not defeated, and the officer is not relieved of liability, if the intervening cause "was foreseeable or reasonably might have been foreseen by the wrongdoer." Schmelz v. Sheriff of Monroe County, 624 So. 2d 298, 298 (Fla. Dist. Ct. App. 1993).

Thus, in suicide cases, Florida courts have treated as the key inquiry whether "it was reasonably foreseeable that harm would befall [the inmate] either directly or indirectly as a result of the actions and omissions of the [corrections officers]." Overby v. Wille, 411 So. 2d 1331, 1332 (Fla. Dist. Ct. App. 1982).

Florida's courts have repeatedly stressed that this basic question is not one for the court to answer as a matter of law, but rather is properly left to the trier of fact for resolution. See, e.g., Schmelz, 624 So. 2d at 299 ("The question of whether an intervening cause is foreseeable is for the trier of fact. Confronted with conflicting evidence as to the foreseeability of [the inmate's] actions, it was for a trier of fact to determine whether [the inmate's] own actions constituted the unforeseeable intervening cause of his injuries." (citation omitted) (citing Gibson v. Avis Rent-A-Car Sys., Inc., 386 So. 2d 520 (Fla. 1980))); Hutchinson, 548 So. 2d at 885 ("Whether the [sheriff and his deputies] were negligent in failing to

protect the decedent, and whether the harm which befell him, albeit at his own hand, was within the scope of such negligent conduct so as to make such harm reasonably foreseeable under the facts here, are issues for the trier of fact."); Overby, 411 So. 2d at 1332 (observing that "the question of whether the intervening cause was foreseeable is ordinarily one for the trier of fact," and holding that "it was error to find that, as a matter of law, injury to [the inmate] was not reasonably foreseeable").

Indeed, under Florida law, the evidentiary threshold for sending this claim to the jury is low. "Only a total absence of evidence to support an inference that the intervening cause was foreseeable justifies the court in removing the question from the trier of fact." Overby, 411 So. 2d at 1332 (emphasis added); see also Moore v. Morris, 475 So.2d 666, 668 (Fla. 1985) ("Summary judgments should be cautiously granted in negligence and malpractice suits. The law is well settled in Florida that a party moving for summary judgment must show conclusively the absence of any genuine issue of material fact and the court must draw every possible inference in favor of the party against whom a summary judgment is sought. A summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law. If the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable

50

inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it." (citations omitted))

Nevertheless, without specifically acknowledging Florida law's strong preference for a jury's resolution of the foreseeablity question, the district court found the evidence insufficient as a matter of law to support Cook's negligence claim. The court reasoned:

> The red flags that have been alluded to that the plaintiffs suggest should have alerted persons to the fact that he was a suicide risk do not rise to the level of being foreseeable. . . . The evidence is simply not there that there was anything that would alert a reasonable person following the established policies and procedures of the Monroe County Sheriff's Office for the handling of inmates that would have alerted anyone to the fact that he was a suicide risk.

After thorough review of the evidence presented at trial and of the applicable Florida law, we disagree.

Four Florida cases involving negligence claims arising out of prison suicides guide our analysis. In Guice v. Enfinger, the First District Court of Appeals addressed the case of an inmate who was arrested while intoxicated and subsequently placed in the jail sickbay, where he apparently slept for several hours, before an employee discovered that he had hanged himself by his belt. The court concluded that "the deceased suicide was not sufficiently foreseeable to impose upon the Sheriff's employees the duty to remove the deceased's belt,"

51

finding "no facts in the record to indicate that the deceased had suicidal tendencies and no facts to indicate that the booking officer at the jail should have been suspicious of suicidal tendencies of the deceased." Guice, 389 So. 2d at 271.

However, in three subsequent cases involving prison suicides, Florida's courts found summary judgments to have been entered erroneously, based on the existence of some evidence to support a jury finding of negligence. In Overby v. Wille, the decedent had flagged down a policeman and requested to be taken to a mental health facility, explaining that he thought he might have hurt someone. Instead, he was placed in jail, where he hanged himself by his belt. The Fourth District Court of Appeals concluded that the decedent's request to be taken to the mental health facility, as well as his unprovoked violent behavior during the booking process, and the fact that jail employees labeled him a "probable Signal 20," a designation that "refers to mental and emotional instability of some type," constituted sufficient evidence to support a finding that his suicide was foreseeable. See Overby, 411 So. 2d at 1332-33. "Under these circumstances," the court concluded, "it was error to find that, as a matter of law, injury to Overby was not reasonably foreseeable." Id. at 1334.

In Hutchinson v. Miller, the decedent was a fifteen-year-old boy, in jail awaiting trial on a criminal charge, who was harassed, taunted, and threatened

52

with sexual abuse by other juvenile inmates. The Fifth District Court of Appeals concluded that this treatment, "coupled with his withdrawal, his crying and his written appeals for help via his requests for transfer, all of which were known to [the sheriff and his deputies], could justify the inference that some harm to decedent was foreseeable." Hutchinson, 548 So. 2d at 885. Thus, the court concluded, the negligence claim had been improperly removed from the purview of the trier of fact. Id.

Finally, in Schmelz v. Sheriff of Monroe County, the Third District Court of Appeals reversed the summary disposition of a claim involving an inmate whose suicide attempt left him severely brain damaged. Although the inmate "had never either threatened, attempted, or even talked about suicide," the booking officer observed him as subdued and depressed, felt "he might try to do something," and placed him on suicide watch. In addition, the watch officer observed him as "real flustered," nervous, and worried. Based on this "conflicting evidence as to the foreseeability of Schmelz' actions," the court concluded that "it was for a trier of fact to determine whether Schmelz' own actions constituted the unforeseeable intervening cause of his injuries." Schmelz, 624 So. 2d at 299.

The evidence in the case before us, as in Overby, Schmelz, and Hutchinson, is "conflicting" as to foreseeability, but is sufficient to enable a jury to find that

Tessier's suicide was a reasonably foreseeable consequence of acts and omissions of MCDC employees. While Tessier never threatened or otherwise mentioned suicide, evidence presented at trial revealed that Tessier made two written requests to see a psychiatrist, one on each of the two days immediately preceding his suicide. And, in his second request, Tessier stated that he was "mentally sick" and asked to see a psychiatrist "as soon as possible." In spite of these requests, Tessier was never seen by any mental health professional. Moreover, MCDC Deputies Kerr, Malopolski, and Whortebury all observed him as being nervous and anxious. Deputy Kerr specifically observed Tessier apparently having an anxiety attack, and based on Tessier's complaints of chest pain, Deputy Kerr sent him to Medical. Tessier's nervous, anxious condition prompted Deputy Malopolski to instruct him to take deep breaths and relax, and to push the intercom on the wall if he needed assistance. Deputy Malopolski thereafter responded to several intercom calls by Tessier, and on one occasion found Tessier bent over on his knees on the floor of his cell, apparently having trouble breathing, after which Deputy Malopolski sent him back to Medical.

Under Florida law, these facts amount to sufficient evidence "such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions" as to the foreseeability of Tessier's suicide and, accordingly, the

54

negligence of MCDC employees in failing to prevent it.  Williams v. Motorola, Inc., 303 F.3d 1284, 1289-90 (11th Cir. 2002).  The Sheriff's motion for judgment as a matter of law on this claim should, therefore, have been denied, and the case submitted to the jury as finder of fact.  See id.  Accordingly, reverse the judgment of the district court as to this claim and remand for further proceedings consistent with this opinion.[14]

IV.

After carefully reviewing the record, we conclude that the district court erred in granting judgment as a matter of law for the Sheriff on Cook's vicarious liability negligence claim under Florida law.  However, we affirm the district court's grant of judgment as a matter of law in favor of the Sheriff on Cook's § 1983 claim and on her Florida law negligent training and supervision claim.  We further hold that the district court acted within its discretion in excluding evidence of other suicides within the MCDC and the testimony of Cook's proffered suicide

---

[14]On remand, our earlier conclusion that the district court acted within its discretion in excluding the testimony of Dr. Maris, Cook's proffered suicide expert, should not be read to preclude Cook from re-urging Dr. Maris' testimony, nor should it be read as barring the district court from reconsidering whether Dr. Maris' testimony might assist the trier of fact in resolving Cook's vicarious liability negligence claim.  We remind Cook that if she seeks to reintroduce Dr. Maris' testimony, she must present it in a manner sufficiently precise, specific, and well-grounded to persuade the trial court that it would indeed assist the trier of fact.

expert. Accordingly, we reverse the district court's judgment as a matter of law on the vicarious liability negligence claim, and affirm in all other respects.

On remand, the district court should consider whether to continue to exercise supplemental jurisdiction over Cook's state law vicarious liability negligence claim, which is all that remains in this case. Because no basis for original federal jurisdiction presently exists, the district court has the discretion to decline to exercise supplemental jurisdiction. See 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."); see also, e.g., Rose v. City of Fort Lauderdale, 279 F.3d 1271, 1288 (11th Cir. 2002) (observing that whether to continue to exercise supplemental jurisdiction is a decision that "should be and is vested in the sound discretion of the district court"). In making this decision, the court "should take into account concerns of comity, judicial economy, convenience, fairness, and the like." Lewis, 260 F.3d at 1267 (citations and internal quotation marks omitted). Because this case was originally filed in state court and removed to federal court pursuant to 28 U.S.C. § 1441, if the district court declines to continue to exercise supplemental jurisdiction, Cook's remaining claim should be remanded to state court. See id.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.