[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12151
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 29, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-01705-CV-T-26-EAJ

RUSSELL ROGERS,

Plaintiff-Appellant,

versus

GRADY JUDD,
in his official capacity as Sheriff
for Polk County, Florida,
PATRICK RENNEY,
SANDRA BARRETT,
RONALD ODOSKI,

Defendants-Appellees,

ANDREW SKIGEN,

Interested Party-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 29, 2010)

Before TJOFLAT, BIRCH and ANDERSON, Circuit Judges.

PER CURIAM:

Russell Rogers, a Florida state prisoner proceeding pro se, appeals the district court's dismissal of his state law assault, battery, and negligence claims against Grady Judd, in his official capacity as sheriff for Polk County, Florida, and detention deputies Patrick Renney, Sandra Barrett, and Ronald Odoski, in their individual capacities (collectively, "the defendants") as time-barred, and the jury's verdict in favor of deputies Renney, Barrett, and Odoski on Rogers's 42 U.S.C. § 1983 claim alleging that the deputies subjected him to cruel and unusual punishment, in violation of the Eighth Amendment. After review of the record and the parties' briefs, we AFFIRM.

## I. BACKGROUND

On 21 September 2007, Rogers, with the assistance of counsel, filed a complaint, which he later amended, against the defendants, alleging that they violated his Eighth Amendment right to be free from cruel and unusual punishment

2

when, on 17 February 2004, in the Polk County Jail, deputies Renney, Barrett, and Odoski illegally seized, beat, applied mace to, and tortured him while he was handcuffed behind his back, causing him permanent injury. R1-1; R1-19 at 3-6, 9-11, 14-16. Rogers also asserted state law claims of (1) assault, battery, and false imprisonment against the defendants, and (2) negligence against Judd in the hiring, training, disciplining, and supervising of deputies Renney, Barrett, and Odoski. R1-19 at 6-9, 11-14, 16-26.

The defendants answered, denying the allegations and asserting various affirmative defenses, including that (1) Rogers's action was untimely because it was not brought within one year of the matter complained of, as required by Fla. Stat. § 95.11(5)(g), and (2) the defendant deputies (a) held a reasonable belief that Rogers would injure them or others if not repelled by force, and (b) used a reasonable amount of force under the circumstances. R1-20, 23 at 9. The district court granted the defendants' motion for summary judgment as to Rogers' § 1983 claims against Judd and as to all of Rogers' false imprisonment claims. R1-39 at 11-23; R1-48 at 9. Although the court denied summary judgment as to Rogers' assault, battery, and negligence claims, see R1-48 at 9-10, it subsequently dismissed these claims after finding that they were barred by Fla. Stat. § 95.11(5)(g), which prescribes a one-year statute of limitations for "an action

3

brought by or on behalf of a prisoner . . . relating to the conditions of the prisoner's confinement," R3 at 13-14. The only claims remaining for the jury to consider were Rogers' § 1983 claims against Renney, Barrett, and Odoski.

Prior to trial, Rogers filed a motion in limine objecting to evidence, including photographs, of injuries sustained by Raymond Noble, a prison deputy, following a confrontation between Noble and Rogers that occurred just prior to the incident alleged in the complaint. See R1-58; R1-88 at 4. Rogers conceded that his altercation with Noble was relevant as to the general background of what happened on the day he alleges he was beaten, but argued that the photographs and "specifics [of] [how] bad [Rogers] beat [Noble] up" were unduly prejudicial. R2 at 86-87.

The district court overruled Rogers' objection, finding that the incident with Noble was "inextricably intertwined" with the allegations in the complaint and that the injuries sustained by Noble, to the extent they were known to the defendant deputies, were "relevant in terms [of the] use of force that they felt was appropriate under the circumstances." *Id.* at 89. With respect to the photographs, the court found that their probative value was not outweighed by the danger of unfair prejudice, and received them into evidence accordingly. *Id.* at 89, 91.

Rogers also objected to the introduction of evidence that he had been

4

involved in a physical altercation with another detention deputy, Larry Traylor, on 19 June 2002. See R1-88 at 5; R2 at 99-100. He conceded that this incident, if known to the defendants, was relevant to the defendants' state of mind on the day of the incident alleged in the complaint, but argued that the defendants were "trying to bring in more specifics of that act than would be necessary." R2 at 99-100. Rogers further argued that this incident, unlike the incident involving Noble, was not "inextricably intertwined" with the events giving rise to the complaint because it occurred two years earlier. *Id.* at 100. The defendants countered that this evidence was significant because Barrett personally witnessed and was involved in the altercation between Traylor and Rogers, and because the other defendant deputies had been briefed on the incident and had spoken to Traylor directly about it. *Id.* at 100-02. The evidence was therefore "relevant . . . as to [the defendants'] perception [of] [the] threat" Rogers posed. *Id.* at 102. The court agreed that evidence of the altercation between Traylor and Rogers, including photographs of Traylor following the altercation, was admissible. *Id.*

The parties next quarreled over the relevance of the fact that Rogers was serving a life sentence. *Id.* at 104. The defendants argued that Rogers' sentence was relevant "to shed light on the state of mind of [the defendants] and their perception of [the] threat" because "[if] [they] were aware that [Rogers] had a life

5

sentence, a serious sentence, then . . . their perception [of] [the] threat would be more than [if] [they] knew he was just there for a parking ticket." *Id.* at 105. Rogers countered that a life sentence itself is not relevant because a person could be sentenced to life imprisonment for a child sex crime, which would not make him a threat to a deputy. *Id.* at 110. Furthermore, Rogers argued, even if evidence that he was serving a life sentence were relevant, it was a prior bad act under Federal Rule of Evidence 404 and was prejudicial, especially in light of the evidence regarding the Noble and Traylor incidents. *Id.* The court disagreed, finding that the evidence was both highly relevant and highly probative. *Id.* at 110-11.

After ruling on the evidentiary issues, the district court heard the testimony of Rogers, Noble, and defendants Odoski, Barrett, and Renney. Rogers testified that on 17 February 2004, he left his cell to go see the prison chaplain. *Id.* at 224. When Noble saw Rogers, he told Rogers to return to his cell. *Id.* As Rogers was walking back to his cell, he picked up a garbage can and threatened to throw trash at Noble. *Id.* Noble grabbed him from behind and a struggle ensued. *Id.* at 225. Deputy Supinger, who also was present, sprayed mace in Rogers' face, impairing his vision. *Id.* at 225-26. Rogers was subsequently handcuffed and escorted to the nurse's station. *Id.* at 226. Rogers testified that while he was standing in the

corner of the nurse's station waiting to be treated, Odoski bent back his thumbs, slammed his head into the wall, and kicked him. *Id.* at 227-29. Rogers testified that Renny also participated in the incident at the nurse's station and that Sergeant Barrett was present but did not order Odoski and Renney to stop. *Id.* at 235-37, 250. After leaving the nurse's station, Odoski and Renney took Rogers to the isolation dorm. *Id.* at 236. Once there, either Odoski or Renney, he was not sure which deputy, tripped him, causing him to fall face-first onto the concrete floor. *Id.* Odoski began to choke him while Renney kneed or kicked him in the back. *Id.* Barrett was present during this incident, but did nothing to stop it. *Id.* at 236-37. Rogers testified that he suffered injuries to the left side of his face, which required him to have jaw surgery, and soft tissue damage in his wrist. *Id.* at 229-33, 239. Rogers testified that, from the time he was first handcuffed, he never once resisted. *Id.* at 237. He admitted, however, that earlier he had beaten Noble's face, had tried to gouge Noble's eye out with his fingernail, and had thrown Noble against the wall. *Id.* at 245-46.

Noble testified that when he saw Rogers outside of his cell on 17 February 2004, he asked Rogers three to five times to return to his cell, but Rogers refused and threatened to throw a nearby garbage can at him. R4 at 85-92. Noble then kicked Rogers in the shin, got behind him, and wrapped his arms around Rogers'

7

upper torso. Id. at 88. When Noble lost his grip, Rogers turned toward Noble, grabbed him by the waist, picked him up, and slammed him against the wall. *Id.* Odoski, who had been alerted by radio that Noble needed assistance, came to Noble's aid. *Id.* at 89; R2 at 160, 200-01.

Odoski testified that when he reached Noble, he saw Rogers face down, on his stomach, with his arms underneath his body. R2 at 201. Noble was straddling Rogers, attempting to get Rogers' arms out from under him so that he could be handcuffed. *Id.* Another deputy, Deputy Supinger, was kneeling beside Rogers, directing Rogers to put his hands behind his back, but Rogers would not comply. *Id.* at 201-02. When Odoski knelt down on Rogers' left side, he noticed blood dripping from Noble's face onto Rogers' back. *Id.* at 202. According to Noble, there was so much blood on his face that he was unable to see. R4 at 89. Renney, who also was present, helped Noble up and escorted him to the nurse's station, while Odoski escorted Rogers. *Id.*; R2 at 168.

When they arrived at the nurse's station, Odoski had to hold Rogers, who was shuffling his feet, twisting his shoulders, and mumbling, against the wall by the back of Rogers' neck to keep him from turning around to see what was going on behind him. R2 at 168-74, 177, 204-07. After the nurse examined Rogers, Odoski, Renney, and Barrett took Rogers to an isolation cell. *Id.* at 188-89, 208.

8

Once inside the isolation cell, Rogers freed himself from Odoski, faced him "in a violent manner," and said, "remember my face, MF'er." *Id.* at 208. Odoski took Rogers' statement as a threat, believing that Rogers might kick or head-butt him, and "took him down to the floor." *Id.* Odoski testified that he knew of Rogers' violent nature, considered him a very dangerous inmate, and tried to control Rogers as best as he could using the least amount of force necessary. *Id.* at 211. Odoski was aware of the fight between Rogers and Traylor that had occurred about a year and a half earlier, and that following the fight, Rogers was classified as a Code D inmate, which meant that he was a disciplinary problem and had to be kept in isolation. *Id.* at 212-13. Odoski recalled that Rogers' altercation with Noble occurred shortly after Rogers was released back into the general population. *Id.* at 213-14. Odoski further testified that he knew Rogers was serving a life sentence, and this fact, combined with his knowledge of what Rogers had done to Traylor and his having witnessed the injuries Rogers inflicted upon Noble, led him to perceive Rogers as an extreme threat. *Id.* at 214-15.

Deputy Renney testified that when they were in the nurse's station on 17 February 2004, Rogers was constantly mumbling and making threats under his breath. R3 at 118, 125-26. Renney recalled that Odoski had his hand on the back of Rogers' neck or upper back and was trying to hold Rogers' face in the corner of

9

the room. *Id.* at 129. When Rogers tried to turn his head, Odoski would push his face so that it was facing straight ahead. *Id.* at 131. Renney testified that he was aware of the incident that had taken place between Rogers and Traylor and had witnessed what Rogers had done to Noble. *Id.* at 139-40. Renney also knew that Rogers was serving a life sentence and that he had been a Code D inmate in the past. *Id.* at 140. Renney stated that, based on this knowledge, he was not going to take any chances with Rogers, whom he considered very dangerous. *Id.*

Sergeant Barrett testified that she was present when Odoski had Rogers against the wall in the nurse's station, but did not observe Odoski or Renney use any excessive force on Rogers, who kept making "taunting-type" remarks over his shoulder. *Id.* at 71-73, 101-02. Barrett further testified that she had personally observed Rogers' attack on Traylor during which Rogers tried to "pull [Traylor's] eyes out." *Id.* at 107. The defendants then introduced into evidence photographs of Traylor taken on the day of the altercation. *Id.* at 108. Barrett recalled that Traylor's injuries were actually worse than they appeared in the photographs. *Id.* Barrett testified that on the day in question, she had Rogers' history in mind when she ordered Odoski to keep Rogers restrained. *Id.* at 109. Barrett also confirmed that nobody kneed, punched, or beat Rogers in the isolation cell. *Id.* at 111.

During closing arguments, defense counsel remarked that the United States

was a great country not because of men like Rogers, but in spite of them.  R4 at 184.  With respect to Rogers' fight with Noble that occurred after Rogers was released from Code D status into the general population, defense counsel remarked, "[t]his is what happens to people when you give violent inmates an inch."  *Id.* at 188.  Rogers did not object to these arguments.

The jury returned verdicts in favor of the defendants Renney, Barrett, and Odoski, and Rogers appeals.  R1-110.

## II. DISCUSSION

A.  *Dismissal of Negligence, Assault, and Battery Claims*

Rogers argues that the district court erred in dismissing as time-barred his state law negligence, assault, and battery claims, contending that such claims were subject to a four-year, rather than a one-year, statute of limitations.

We review a district court's determination of state law *de novo*.  *Price v. Time*, 416 F.3d 1327, 1334 (11th Cir. 2005).  Under Florida law, a four-year limitation period applies generally to assault, battery, and negligence claims.  Fla. Stat. § 95.11(3)(a), (o) (2002).  "[A]n action brought by or on behalf of a prisoner . . . relating to the conditions of the prisoner's confinement" must, however, be commenced within one year of when the cause of action accrued.  *Id.* § 95.11(5)(g).  With respect to assault and battery, § 95.11(3)(o) provides that the

11

four-year period applies "*except* as provided in [§ 95.11(5)(g)]." *Id.* § 95.11(3)(o) (emphasis added).

In *Nicarry v. Eslinger*, 990 So. 2d 661, 664 (Fla. Dist. Ct. App. 2008), the Fifth District Court of Appeal held that a prisoner's claim of negligence against the Sheriff of Seminole County, Florida, was an action relating to the conditions of his confinement and was therefore subject to the one-year limitation period under § 95.11(5)(g), rather than the four-year limitation period under § 95.11(3)(a). Rejecting Nicarry's argument that the "four-year statute of limitations for negligence claims applied because he was challenging a single instance of negligence" rather than "a continuous condition of his confinement," the court interpreted the phrase "conditions of the prisoner's confinement" as encompassing both ongoing and isolated prison conditions. *Id.* at 664-65.[1]

---

[1] In reaching this conclusion, the *Nicarry* court relied on two Supreme Court decisions, *McCarthy v. Bronson*, 500 U.S. 136, 111 S. Ct. 1737 (1991) and *Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983 (2002), both of which addressed, under the Federal Magistrates Act, 28 U.S.C. U.S.C. § 631 *et seq*., and the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), respectively, whether a suit alleging a single instance of excessive force constitutes a challenge to a prisoner's conditions of confinement. In *McCarthy,* the Supreme Court held that a prisoner's complaint alleging that prison officials used excessive force when they transferred him from one cell to another was an action "challenging conditions of confinement" under 28 U.S.C. § 636(b)(1)(B), which authorizes the "nonconsensual referral to magistrates for a hearing and recommended findings of prisoner petitions challenging conditions of confinement." 500 U.S. at 137-38, 143-44, 111 S. Ct. at 1739, 1742. The Court rejected the prisoner's argument that "[s]uits alleging that administrators acted unconstitutionally in an isolated incident . . . are not properly classified as 'petitions challenging conditions of confinement,'" reasoning, in part, that "the distinction between cases challenging ongoing conditions and those challenging specific acts of alleged misconduct will often be difficult to identify." *Id.* at 143, 111 S. Ct. at 1742. The Supreme Court subsequently held in *Porter* that the plaintiff-prisoner's § 1983 suit

It is clear in this case that, under *Nicarry*,[2] Rogers' negligence claim against Judd was subject to the one-year limitation period in § 95.11(5)(g), rather than the four-year statute of limitation set forth in § 95.11(3)(a). Although *Nicarry* does not address assault and battery claims specifically, Fla. Stat. § 95.11(3)(o) explicitly states that the four-year statute of limitations for assault and battery applies "except as provided in subsection[] . . . (5)," that is, except where, as here, the action is

_____

alleging that his Eighth Amendment rights were violated when he was severely beaten by corrections officers was an action with respect to "prison conditions" under the PLRA and thus was subject to the PLRA's requirement that he first exhaust administrative remedies. 534 U.S. 516, 519-20, 532, 122 S. Ct. 983, 985, 992. The *Porter* court disagreed with the Second Circuit's interpretation of the term "prison conditions" as meaning "circumstances affecting everyone in the area rather than single or momentary matters, such as beatings directed at particular individuals," noting that "in the prison environment a specific incident may be symptomatic rather than aberrational . . . . An unwarranted assault by a corrections officer may be reflective of a systemic problem traceable to poor hiring practices, inadequate training, or insufficient supervision." *Id.* at 522, 530, 122 S. Ct. at 987, 991 (quotation marks and citation omitted) . The Court further reasoned that the "single occurrence, prevailing circumstance dichotomy" made "scant sense," at least in the context of the PLRA, because such an interpretation would enable a prisoner to "have immediate access to a court when a guard assaults him on one occasion, but not when beatings are widespread or routine[.]" *Id.* at 531, 122 S. Ct. at 991-92. The Court thus concluded that the PLRA's exhaustion requirement for suits "with respect to prison conditions" "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532, 122 S. Ct. at 992. We likewise have held that an inmate's claims of beatings by prison officials were claims related to prison conditions under the PLRA. *See Bryant v. Rich*, 530 F.3d 1368, 1372 (11th Cir. 2008) (stating that 42 U.S.C. § 1997e(a) "applies to all inmate suits alleging excessive force, whether the prisoner alleges an isolated episode of mistreatment or a prolonged and sustained pattern of harassment and intimidation by corrections officers") (quotation marks and citation omitted)).

[2] Given the lack of any persuasive evidence that the Florida Supreme Court would arrive at a conclusion contrary to that reached by the *Nicarry* court, we are bound to follow *Nicarry* in deciding this appeal. *Bravo v. United States*, 577 F.3d 1324, 1326 (11th Cir. 2009) (per curiam) (noting that when applying state law, we are bound to follow an intermediate state appellate court "unless there is persuasive evidence that the highest state court would rule otherwise") (quotation marks and citation omitted)).

brought by a prisoner and "relat[es] to the conditions of the prisoner's confinement," Fla. Stat. § 95.11(5)(g). Because the action in this case "relat[ed] to the conditions of [Rogers'] confinement," the four-year statute of limitations prescribed by § 95.11(3)(o) is inapplicable. The district court thus did not err in dismissing Rogers's assault, battery, and negligence claims, filed more than three years after the accrual thereof, as time-barred.

B. *Evidentiary Issues*

Rogers challenges the jury verdict on his § 1983 claims on the grounds that the district court improperly allowed the defense to introduce evidence related to his altercations with Noble and Traynor as well as evidence that he was serving a life sentence. He argues that the probative value of this evidence was outweighed by the danger of unfair prejudice and should have been excluded. He contends additionally that defense counsel's statements during closing argument, to wit, "[t]his is what happens when you give a violent inmate a[n] inch," and "America is a great country not because of men like Russell Rogers[,] [but] despite men like Russell Rogers," were prejudicial and inflammatory in nature, mandating reversal and a new trial.

We review a district court's evidentiary rulings for an abuse of discretion. *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1103 (11th Cir. 2005).

14

Accordingly, we may not reverse the district court unless we find that it made a clear error of judgment or applied the wrong legal standard. *Id.* at 1104. *See also United States v. Merrill*, 513 F.3d 1293, 1301 (11th Cir. 2008) ("The district court has broad discretion to determine the relevance and admissibility of any given piece of evidence.").

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. The district court may exclude relevant evidence if it determines "that the probative value of the evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.'" *Merrill*, 513 F.3d at 1301 (quoting Fed. R. Evid. 403). *See also United States v. Church*, 955 F.2d 688, 703 (11th Cir. 1992) (recognizing "Rule 403's strong presumption in favor of admissibility"). The district court did not abuse its discretion in determining that the evidence to which Rogers objected was relevant and that its probative value was not substantially outweighed by the danger of unfair prejudice.

The Supreme Court has instructed that when determining whether security

measures taken by prison officials violated a prisoner's Eighth Amendment rights, the relevant inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 1085 (1985) (quotation marks and citation omitted). Factors such as "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted, are relevant to that ultimate determination." *Id.* at 321, 106 S. Ct. at 1085 (quotation marks and citation omitted). "[E]qually relevant are such factors as the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response." *Id.* Moreover, we have noted that an officer's knowledge of an inmate's past violent confrontations with prison guards may be relevant to the assessment of the degree of force that a reasonable officer would have believed was necessary. *Skrtich v. Thornton*, 280 F.3d 1295, 1301 n.7 (11th Cir. 2002).

Rogers' past confrontations with Noble and Traylor, both of which the deputies either witnessed or had knowledge of, was clearly relevant to the issue of the reasonableness of the deputies' belief that the amount of force used was necessary. Further, we cannot conclude that the district court erred in determining

16

that the probative value of this evidence, including photographs of the injuries

sustained by Noble and Traylor, which demonstrated the severity of the harm that

Rogers was capable of inflicting if not controlled, outweighed the danger of unfair

prejudice. We also agree with the district court that evidence of Rogers' life

sentence was relevant to the deputies' perception of the threat he posed and that the

probative value of this evidence was not outweighed by the danger of unfair

prejudice.[3]

Finally, we reject Rogers' argument that defense counsel's statements during

closing argument were so prejudicial as to mandate reversal. "[T]he trial judge is

given considerable discretion to control the tone of counsels' arguments and,

absent an abuse of discretion, the decision of the trial court, which has had the

opportunity to hear the offensive remarks within the context of the argument and to

view their effect on the jury, should not be disturbed." *Allstate Ins. Co. v. James*,

845 F.2d 315, 318 (11th Cir. 1988). On review, we look "to the entire argument,

the context of the remarks, the objection raised, and the curative instruction to

determine whether the remarks were such as to impair gravely the calm and

---

[3] Rogers argues additionally that the district court erred in admitting evidence regarding his past criminal convictions. The defendants correctly point out, however, that this evidence was first introduced by Rogers. *See* R2 at 222-23. Rogers is therefore precluded from arguing on appeal that the court abused its discretion in admitting such evidence. *See United States v. Baker*, 432 F.3d 1189, 1216 (11th Cir. 2005) ("[I]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party.").

dispassionate consideration of the case by the jury." *Id.* (quotation marks and citation omitted).

Because Rogers did not raise a contemporaneous objection to defense counsel's closing statements, we review the admission of those statements for plain error only. *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1179 (11th Cir. 2002). "For there to be plain error, there must (1) be error, (2) that is plain, (3) that affects the substantial rights of the party, and (4) that seriously affects the fairness, integrity, or public reputation of a judicial proceeding." *Id.* "[A] finding of plain error is seldom justified in reviewing argument of counsel in a civil case." *Id.* (quotation marks and citation omitted).

The district court did not plainly err in failing to strike defense counsel's closing remarks. First, counsel's remark that "[t]his is what happens to people when you give violent inmates an inch" was not improper given the context in which it was made. Counsel made this statement when referencing the injuries that Rogers inflicted on Noble after Rogers was removed from isolation and released into the general population. Furthermore, we cannot say that counsel's statement that this country is great despite men like Rogers, even if improper, affected Rogers's substantial rights or the fairness, integrity, or public reputation of the judicial proceeding. *See Brough*, 297 F.3d at 1179-80.

18

## III. CONCLUSION

For the foregoing reasons, we affirm the judgments in favor of the defendants and against Rogers.

**AFFIRMED.**